IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KENNETH AYERS,                                    Case No. 6:08-cv-06287-AA
                                                  OPINION AND ORDER
            Plaintiff,

      v.

LIFE INSURANCE COMPANY
OF NORTH AMERICA,

            Defendant.
_____

Megan E. Glor
Robyn L. Stein
Attorneys at Law, PC
621 SW Morrison St., Suite 900
Portland, Oregon 97205
      Attorney for plaintiff

William T. Patton
Darin M. Sands
Lane Powell, PC
601 SW 2nd Ave., Suite 2100
Portland, Oregon 97204
      Attorneys for defendant

Page 1 - OPINION AND ORDER

AIKEN, Chief Judge:

Kenneth Ayers ("Ayers") filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), against the Life Insurance Company of North America ("LINA").  Ayers alleges that LINA wrongfully denied his claim for long-term disability benefits (the "benefits claim").  The parties filed cross-motions for summary judgment on Ayers' benefits claim. See Fed. R. Civ. P. 56.

In addition, LINA filed a counterclaim to recover overpaid benefits (the "overpayment claim").  The parties also cross-moved for summary judgment on LINA's overpayment claim.  Id.  For the reasons set forth below, Ayers' motion is granted and LINA's motion is denied as to the benefits claim; and the parties' motions are denied as to the overpayment claim.

### BACKGROUND

In 1990, Ayers was hired as an attorney at the law firm of Hancock, Rothert, and Bunshoft ("HRB") in San Francisco, California.  Administrative Record ("AR") 162, 471.  HRB holds a long-term disability ("LTD") plan (the "Policy") with LINA, under which disabled employees are entitled to monthly insurance benefits.  AR 1-20.  While the Policy provides coverage for mental and physical disabilities, it contains a "Mental Illness Limitation" ("MIL"), under which coverage for mental disabilities is limited to twenty-four months of payments.  AR 9.

On February 13, 2002, Ayers filed a claim for LTD benefits under the Policy, alleging that he could no longer work because of

Page 2 - OPINION AND ORDER

chronic fatigue syndrome ("CFS"), fibromyalgia, and depression. AR 161-62. On March 20, 2002, LINA approved Ayers' claim; Ayers thereafter received LTD benefits in the amount of $5000 per month. AR 196-97.

On April 11, 2002, LINA informed Ayers that Allsup, Inc. ("Allsup") was available, free of charge, to assist him in applying for Social Security Disability Income ("SSDI"). AR 203-04. Ayers agreed to Allsup's assistance; on June 12, 2002, Allsup submitted an application for SSDI benefits on Ayers' behalf. AR 205, 209. In October 2002, the Social Security Administration ("SSA") denied Ayers' SSDI claim. AR 261-64. On November 26, 2002, Allsup sought reconsideration of the SSA's unfavorable decision. AR 270. On May 9, 2003, the SSA denied Allsup's request for reconsideration. AR 305.

On October 21, 2004, a hearing was held before an Administrative Law Judge regarding Ayers' SSDI claim. AR 536-72. On May 17, 2005, Ayers notified LINA that he was terminating his relationship with Allsup and retaining independent counsel. AR 785. On November 5, 2005, the Appeals Council denied Ayers' claim. AR 802. On December 20, 2005, Ayers filed a complaint in federal court to review the final decision of the SSA; on November 13, 2006, the court remanded Ayers' case for further proceedings. AR 1008-09.

On September 5, 2007, LINA terminated Ayers' LTD benefits under the MIL, based on its determination that Ayers' disability resulted from depression rather than CFS. AR 1222-28.

Page 3 - OPINION AND ORDER

Accordingly, Ayers stopped receiving benefit payments on October 5, 2007. AR 1227. On March 6, 2008, Ayers appealed LINA's decision; on June 5, 2008, LINA upheld its termination of LTD benefits. AR 1815-17.

On August 28, 2008, Ayers was awarded SSDI benefits, retroactive to March 2002. As such, Ayers received a $108,208.50 lump sum payment from the SSA. Answer to Third Am. Compl. ¶ 87 Ex. C; see also Ayers' Answer to LINA's Countercl. ¶¶ 15-16.

On September 11, 2008, Ayers filed a complaint in this Court to recover LTD benefits from October 6, 2007 through September 8, 2011.[1] Compl. ¶¶ 20-22; see also Third Am. Compl. ¶¶ 51-54. LINA filed a counterclaim, seeking to recover $99,885 in allegedly overpaid benefits. Answer to Third Am. Compl. ¶ 92. The parties subsequently filed cross-motions for summary judgment on both claims.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine dispute as to any material fact and that the [moving party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

---

[1] Ayers turned sixty-five years old on September 11, 2011, at which point he was no longer eligible for benefits under the Policy. AR 5.

Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determined the authenticity of a dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

The parties move for summary judgment on the application and interpretation of the Policy.

## I. Policy Terms

An employee is disabled under the Policy "if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation." AR 4. Under the MIL, LINA will only "pay Disability Benefits [for 24 months] during an Employee's lifetime for a Disability caused by, or contributed to by" depression, anxiety, or a somatoform disorder. AR 9.

Page 5 - OPINION AND ORDER

Cigna[2] has an internal policy which instructs its plan administrators, such as LINA, on how to utilize the MIL. These guidelines explain that the MIL can be exercised in a CFS claim only where all physical symptoms have resolved: "[i]f a physical condition contributes to the total disability, or is either a cause or symptom of a mental condition, then the disability will not fall under the [MIL]." Glor Suppl. Decl. Ex. C, at 2.

Regardless of the basis of the disability, the Policy stipulates that monthly LTD benefits must be "reduced by any Other Income Benefits." AR 4, 10-11. "Other Income Benefits" are defined as "benefits from other income sources, [including] any [SSDI] benefits the Employee . . . receives." AR 11.

Under the Policy, LINA automatically assumes that the employee is receiving Other Income Benefits, and reduces its monthly payments accordingly, unless

> the Employee gives [LINA] proof of the following events: 1) application was made for these benefits; 2) a Reimbursement Agreement is signed; 3) any and all appeals were made for these benefits or the [LINA] determines further appeals will not be successful; 4) payments were denied.

Id.

Specifically regarding SSDI, the Policy states that LINA "will, at its discretion, assist the Employee in applying [for such benefits]." AR 12. If the employee, however, "refuses to participate in, or cooperate with, the Social Security Assistance

---

[2] LINA is a wholly owned subsidiary of Cigna. Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 678 (9th Cir. 2011); see also AR 1222-28, 1815-17.

Program, [LINA] will assume receipt of SSDI benefits until the Employee gives us proof that all administrative remedies are exhausted." Id.

In addition to Other Income Benefits, the Policy provides LINA with the right to recover any overpayments "by either of the following methods: 1) a request for lump sum payment of the overpaid amount; 2) a reduction of any amounts payable under the Policy." Id.

II.  Benefits Claim

Ayers contends that he is entitled to a continuation of LTD benefits because his physical and mental limitations, which prevent him from returning to his regular occupation as an attorney, are caused by CFS.   LINA concedes that, due to his cognitive difficulties, Ayers is no longer able to practice law. See LINA's Resp. to Ayers' Mot. Summ. J. on Benefits Claim 31, 34.   LINA, however, asserts that Ayers' cognitive difficulties arise from depression or a possible somatoform disorder and, as such, the MIL applies.   In addition, LINA argues that Ayers has no physical limitations that prevent him from returning to work as an attorney.

A.   Standard of Review as to the Denial of Ayers' Appeal

Ayers brings this claim pursuant to ERISA's civil enforcement provision.   See 29 U.S.C. § 1132(a)(1)(B).   Section 1132 provides that a "civil action may be brought . . . by a participant . . . to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan." Id.   "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed

Page 7 - OPINION AND ORDER

under a de novo standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits." Firestone Tire & Rubber Co. v. Brunch, 489 U.S. 101, 115 (1989); Opeta v. NW Airlines Pension Plan for Contract Emps., 484 F.3d 1211, 1217 (9th Cir. 2007).

Where, as here, the plan does not grant such discretionary authority, "'[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits.'" Opeta, 484 F.3d at 1217 (quoting Abitie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006)). The party seeking to recover benefits under the terms of a LTD plan bears the burden of proving his entitlement to such benefits. Muniz v. Amec Const. Mgmt., 623 F.3d 1290, 1294 (9th Cir. 2010).

B. Chronic Fatigue Syndrome

Because this case hinges on whether Ayers has introduced enough evidence to establish that he has CFS, a basic understanding of the condition is critical to evaluating the benefits claim.

CFS is a somewhat controversial disorder; there are no objective diagnostic criteria for CFS, which has prompted a segment of the medical community to question its existence as a bonafide medical condition. Salomaa, 642 F.3d at 677. Further, "[d]espite extensive research, the etiology of [CFS] is unknown." Id. Therefore, because "the condition 'does not have a generally accepted dipstick test,'" "[t]he standard diagnosis technique for [CFS generally] includes testing, comparing symptoms to a detailed Centers for Disease Control list of symptoms, excluding other

possible disorders, and reviewing thoroughly the patient's medical history." Id. (quoting Friedrich v. Intel Corp., 181 F.3d 1105, 1112 (9th Cir. 1999)).

Here, LINA's plan expressly incorporates the Centers for Disease Control's ("CDC") diagnostic criterion for CFS. AR 1445-46. Accordingly, in addition to ruling out other causes, the following criteria must be met in order to receive a diagnosis of CFS:

1) [t]he patient must have clinically evaluated, unexplained persistent or relapsing chronic fatigue that is of new or definite onset (i.e., not lifelong), is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities; and 2) [t]he patient must have concurrent occurrence of four or more of the following symptoms: substantial impairment in short-term memory or concentration; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern, or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours.

AR 1445-46, 1015-16; Stip. Re Exs. Submitted with Ayers' Admin. Appeal Ex. 17, at 2; see also Salomaa, 642 F.3d at 677.

C.  Summary of the Medical Evidence

The administrative record contains hundreds of pages of medical reports relating to Ayers' condition. Because the record is so extensive, the Court will focus on summarizing those relevant reports that occurred on or after the alleged onset date of disability.

i.  Onset of Symptoms

Ayers began having fatigue-related health problems in June 1999. AR 31, 34. He underwent a number of tests, including an HIV

test, blood work, and an EKG, in order to exclude potential causes. AR 25, 31, 32. All test results were normal. AR 33.

By July 1999, Ayers' symptoms had increased; he was suffering from chronic fatigue, stress, sore throat, headaches, muscle pain, unrefreshing sleep, a cough, and chest pain. AR 34, 62. Ayers engaged in a battery of additional tests in order to rule out other potential causes, including a treadmill test and chest x-rays, as well as blood, stool, and urine tests to rule out infectious diseases; these test results were also normal. AR 36-37, 40-53, 59-61, 63-67, 71-76. Despite these problems, Ayers "denie[d] any symptoms of depression or anxiety" at that time. AR 34.

In the beginning of 2000, Ayers began experiencing cognitive difficulties, such as short-term memory loss and concentration problems. AR 63, 71. These symptoms, combined with the unremarkable test results, prompted Dr. Frierson, M.D., to speculate that Ayers had CFS. AR 71. Nevertheless, Ayers continued to work at HRB until September 25, 2001. AR 78.

ii. Dr. Bartz

Ayers began seeing Robert Bartz, M.D., a physician, in 1999. Around the time Ayers took medical leave in 2001, Dr. Bartz noted that Ayers was depressed and "crying" because he was no longer able to work. AR 81. This was the first time that Ayers' depression was noted in the record. Dr. Bartz referred Ayers to a radiologist, an ophthalmologist, a neurologist, a rheumatologist, and a psychotherapist. AR 82-83, 101-04, 111. These doctors ran additional tests but reported no abnormalities. AR 114, 437.

### iii.   Mr. Robinett

In October 2001, Ayers began weekly psychotherapy sessions with Mark Robinett, a marriage and family therapist.  Mr. Robinett prescribed Paxil in December 2001; Ayers discontinued the Paxil, with Mr. Robinett's consent, in December 2002.  AR 112, 150, 335. While Paxil alleviated Ayers' anxiety and depression, it had no impact on his cognitive difficulties.  AR 147, 491.  Ayers stopped seeing Mr. Robinnett in 2002 when he moved to Oregon.  AR 320.

On March 25, 2002, at LINA's request, Mr. Robinett provided a psychological assessment of Ayers.  AR 198-200.  He opined that Ayers suffered from "major depression," and identified CFS and fibromyalgia as "significant stressors."  AR 199.  He confirmed that, prior to 2001, Ayers "ha[d] never experienced any previous depressions or anxiety problems.  This is the first time [he] has been in psychotherapy for any reason."  Id.

On May 15, 2002, Mr. Robinett provided an additional psychological assessment to LINA.  AR 241.  Mr. Robinett listed Ayers' current symptoms as "depression, sleep problems, cognitive dysfunction, anxiety, weight gain."  AR 242.  Mr. Robinett's observations and clinical findings included "low energy, discouragement, slow progress, scattered/difficulty in focusing on one topic or issue."  Id.  When asked to approximate a return to work, Mr. Robinett estimated eight to sixteen months, due to Ayers' "very slow recovery from depression and poor cognitive function." AR 243.  At that time, Mr. Robinett diagnosed Ayers with CFS and fibromyalgia.  Id.

On July 23, 2003, Mr. Robinett provided LINA with a third report.  AR 320-21.  Mr. Robinett explained, however, that "all remarks [were] based on sessions from 2002."  AR 321.  At that time, Mr. Robinett listed Ayers' symptoms as "low energy, anxiety, brain confusion & fatigue, chronic fatigue, [and] muscle pain."  AR 320.  Accordingly, Mr. Robinett opined that Ayers was "able to function for about 1 to 1.5 hours per day, then exhausted."  AR 321.  Mr. Robinett concluded that Ayers "was not able to return to work."  Id.  Consistent with his previous reports, Mr. Robinett continued to diagnose Ayers with CFS.  AR 320.

### iv.   Dr. Bastien

In November and December 2001, HRB commissioned an independent neuropsychological examination from Sheila Bastien, Ph.D., to determine whether Ayers could return to work as an attorney.  AR 113-27.  Dr. Bastien is the only professional specializing in CFS that examined Ayers or reviewed his medical records; she has evaluated close to 1800 CFS patients and has published numerous scientific articles on CFS.  AR 126, 88-100.

After interviewing Ayers and conducting four days of testing, Dr. Bastien concluded that Ayers could no longer practice law.  AR 126.  Her testing revealed cognitive slippage, a drop in IQ, motor functioning problems in the hands, and deficits in verbal fluency, sequencing, set shifting, executive function, math calculations, abstract reasoning, and information processing.  AR 118-26.  Regardless, Ayers' full-scale IQ remained high at 126.  AR 118.  There was a disparity, however, between his sub-scores: Ayers'

Page 12 - OPINION AND ORDER

verbal IQ was 130, yet his performance IQ was only 116.  Id.  Dr. Bastien specifically remarked upon the "split" in Ayers' verbal and performance scores, noting that this pattern was very common in CFS patients.  AR 118, 93.

Dr. Bastien also found that Ayers was severely depressed, with a score of 43 on the Beck Depression Inventory and a Global Assessment Functioning ("GAF") score of 45.  AR 125-27.  Dr. Bastien, however, expressly stated that "[d]epression alone cannot account for these test results, particularly the lateralized findings on motor and sensory tests" because they did "not [follow] the usual pattern for depression"; as such, Dr. Bastien explained that, even though depression can effect cognitive functioning, that was not true in Ayers' case: "[i]t is my opinion that all of [the test scores] are not [influenced by Ayers' depression].  This particular pattern of impairments is typical in patients with [CFS]."  AR 126.  As such, Dr. Bastien diagnosed Ayers with "Cognitive Disorder, secondary to [CFS], Fibromyalgia, with a secondary depression and anxiety."  AR 127.  Accordingly, Dr. Bastien recommended that Ayers "[p]ursue diagnosis and treatment with a [CFS] specialist" and "[c]onsider a brain SPECT scan . . . to further elucidate his problems and treatment options."  AR 127. HRB terminated Ayers' employment based on Dr. Bastien's findings. AR 78.

### v.  Dr. Johnson

Ronald Johnson, M.D., conducted a psychiatric examination of Ayers on September 5, 2002.  AR 149-52.  Dr. Johnson noted that

Ayers' lifestyle had changed markedly since the onset of symptoms.
AR 150.   Dr. Johnson also noted that Ayers

> does have difficulty flexibly interacting, and that he
> has to strain to organize the features of my questions,
> and to assemble his responses. Considering his past work
> as an attorney, it seems likely that he is having
> difficulty fluently expressing himself in a comparative
> way to his past stated functioning.

AR 151.   Accordingly, Dr. Johnson concluded that Ayers "presents
the general picture of depression in the adult years as he faces
his stated physical symptoms which appear to have been described
and documented in prior medical and psychological testing reports";
he thus diagnosed Ayers with a "[m]ood disorder due to stated
physical condition of [CFS] and fibromyalgia (with features of both
depression and anxious tension)."   Id.

### vi.   Dr. Ravuri

On March 26, 2003, Ayers established care with Rajesh Ravuri,
M.D., an internist, in order to receive treatment for "[CFS],
depression and hypertension."   AR 300.   At that time, Dr. Ravuri
reported that Ayers' depression had resolved: "[t]he patient denies
any problems with depression at this time so he will just continue
with exercise and relaxation and [remain] off of medications for
now."   AR 302.   Regarding CFS, Dr. Ravuri recommended that Ayers
"[c]ontinue with exercise and conservative management."   Id.

In a follow-up report dated May 5, 2003, Dr. Ravuri noted that
Ayers "had no specific complaints."   AR 303.   The doctor also
indicated that, while Ayers was "feeling a lot better," he was
still suffering from "some cognitive problems."   Id.   Accordingly,

Page 14 - OPINION AND ORDER

Dr. Ravuri recommended that Ayers continue with "[c]onservative management and exercise and proper diet" to treat his CFS. Id.

On July 3, 2003, Dr. Ravuri provided a psychological assessment at LINA's request. AR 322. Dr. Ravuri reported that Ayers suffered from "memory problems, tiredness, fatigue, [and] cognitive problems." Id. Based on Dr. Bastien's neuropsychological report, Dr. Ravuri listed CFS as Ayers' primary diagnosis. Id. On the same day that he submitted his report to LINA, Dr. Ravuri referred Ayers to another health care provider because he did not "feel confident enough to evaluate the progression or regression of [CFS]." AR 330.

vii. Dr. Nolan

On April 5, 2003, Nick Nolan, M.D., Ph.D., performed a one-time examination on Ayers. AR 147-48. Dr. Nolan noted that "depression no longer seems to be an issue" for Ayers. AR 147. The doctor also remarked that Ayers "gives a good history for the cyclic problem of flulike illness associated with the vague entity of [CFS]." AR 148. As a general proposition, however, Dr. Nolan stated that he does not believe in CFS as a legitimate medical condition. Id. As such, Dr. Nolan diagnosed Ayers with "possible dementia" due to the cognitive deficiencies he displayed during testing. Id.

viii. Dr. Oelke

In October 2003, Ayers began seeing David Oelke, M.D., and

continues to see him every two to four months.[3]   AR 335, 1371. During his intake interview, Dr. Oelke noted that Ayers "has had depression and problems with cognitive activities.   He has been told that he has [CFS]."   AR 336.   Dr. Oelke, however, did not diagnose CFS at that time.   AR 335-37.

On December 23, 2003, Dr. Oelke saw Ayers "for follow up of his [CFS]."   AR 362.   The doctor reported that Ayers was "better in some respects" but was still suffering from fatigue, which requires him to "take naps many times in the afternoon."   Id.   Dr. Oelke also noted that Ayers reported some muscle aches but was "[m]entally somewhat better."   Id.

On January 14, 2004, Dr. Oelke completed a physical ability assessment ("PAA") at LINA's request.   AR 360.   In the PAA, Dr. Oelke opined that Ayers could perform fine manipulation and simple grasping "frequently" (between two-and-a-half and five-and-a-half hours per eight hour period);   however, most other physical activities, including standing, sitting, walking, reaching, lifting and carrying, could only be performed "occasionally" (less than two-and-a-half hours per eight hour period).   Id.   Dr. Oelke also stated that Ayers was completely unable to work extended shifts or overtime.   Id.

On March 25, 2004, Dr. Oelke again examined Ayers.   AR 385. Dr. Oelke noted that Ayers "had a little bit of a setback" because

---

[3]   Ayers was unable to find a CFS specialist in the Bandon, Oregon area per Dr. Ravuri's referral; as such, he began seeing Dr. Oelke, an internist, to treat his CFS and hypertension.   AR 335-37.

he had more trouble sleeping, more frequent sore throats, and fevers. Id. Dr. Oelke also remarked that Ayers' "[c]ognitive and mental capacity [was] still quite limited." Id. Accordingly, Dr. Oelke concluded that Ayers "still has very marked limitations in how much he can do in a day." Id.

Dr. Oelke's June 3, 2004 report indicates that Ayers was "doing about the same" and his CFS was "still quite significant." AR 406. In the September 2, 2004 report, Dr. Oelke noted that Ayers was "doing somewhat better." AR 450. As such, Dr. Oelke reported that Ayers was "thinking of trying to get a part-time job. He can function for maybe three hours, even sometimes four hours, without having to take a nap or lose his ability to concentrate and solve problems, etc." Id.

By December 12, 2004, however, Dr. Oelke remarked that Ayers' condition had once again deteriorated: "[Ayers' symptoms have] basically gotten much worse since last summer." AR 659. Dr. Oelke noted that Ayers was having increased problems with concentration and memory, but opined that some of these symptoms may be related to recent stressors, such as his SSA hearing. Id.

Dr. Oelke's regular reports from February 2005 through April 2006 indicate that Ayers continued to suffer from fatigue and cognitive difficulties, but that his condition was stable. AR 764, 787, 791, 796, 797, 810, 885, 889. Nevertheless, Dr. Oelke opined that Ayers remained "totally disabled from [CFS]." AR 810. By July 2006, Dr. Oelke remarked that Ayers began having "a lot more problems with his [CFS]." AR 844. Dr. Oelke's reports from July

Page 17 - OPINION AND ORDER

2006 though December 2007 note persisting CFS symptoms.  AR 1182, 1363-71.  Specifically, Ayers continued to report problems with night sweats, coordination and balance, hand movements, muscular pain, cough, memory, concentration, fatigue, comprehension, headaches, and sleep.  AR 1365-71.  As such, Dr, Oelke reiterated that Ayers "is totally disabled with his [CFS]."  AR 1182.

### ix.   Dr. Villanueva

On October 6, 2004, Michael Villanueva, Psy.D., examined Ayers at LINA's request; in addition to performing an examination, Dr. Villanueva reviewed Ayers' medical records, including reports from Drs. Bartz, Bastien, Oelke, and Mr. Robinett.  AR 468-76.

At the examination, Ayers reported symptoms of "fatigue, a feeling of 'foggy brain,' difficulties with eyesight, pain, flulike symptoms, sore throat, night sweats, and sleep problems."  AR 470. Ayers indicated that some variation of these symptoms had persisted since 1999.  Id.  The doctor also reported that Ayers "did not have treatment for depression . . . until around October 2001."  AR 472. Dr. Villanueva went on to note that, at the time of his examination, Ayers was not seeing a counselor or taking any anti-depressant medication.  Id.

Regarding the test results, Dr. Villanueva stated that "the findings are somewhat surprising."  AR 473.   Although Ayers indicated that he was no longer depressed and was "engaged in increasing amounts of activity," his IQ scores dropped substantially: "[h]is present full-scale IQ is 98.  Previous full-scale IQ was 126.   Verbal IQ declined from 130 to 105, and

performance IQ went from 116, to 89." AR 474.

Other test results also revealed cognitive difficulties: "score on arithmetic seems a bit low compared to academic achievement," "[p]erformance on Trials A and B are both below normal limits, suggesting general motor slowing, problems with visual motor integration, and decreased executive function," "[v]isual memory is mildly below normal limits," "Continuous Visual Memory Test is below expectations," "[l]anguage fluency is below normal limits - both lexical fluency as well as semantic fluency," "demonstrates some slowing with dominant hand on the Grooved Pegboard," and "[s]et shifting remains a significant difficulty." AR 474.    Despite these "somewhat surprising results," Dr. Villanueva opined that Ayers was not malingering and that he put forth good effort on testing.   AR 473.

Dr. Villanueva diagnosed Ayers with a GAF score of 65, indicating mild depression.   AR 475-76, 652.   Regardless, the doctor listed depression as Ayers' primary condition and the cause of his cognitive impairments.    AR 475.    Nevertheless, Dr. Villanueva concluded that "[c]urrent cognitive test findings support [Ayers'] contention that he does not have sufficient cognitive ability . . . to perform work as an attorney."   AR 476.

x.   Dr. Benincasa

After receiving Dr. Villanueva's report, LINA determined that it was unclear whether Ayers' "cognitive dysfunction is due to depression or [CFS]."   AR 1934.   Accordingly, in November 2004, LINA hired Daniel Benincasa, Psy.D., an in-house psychologist, to

review Dr. Villanueva's report and perform a "Peer Review tie breaker to determine if cognitive dysfunction is due to depression or physical/chronic fatigue."[4]  AR 1928, 1931-32, 651-53.

Dr. Benincasa noted that the reduction in Ayers' IQ scores were "an odd finding given the higher previous test scores and no indication of a progressive neurological condition which would detract from cognitive function."  AR 651.  The scores were also "odd" because Ayers "present[ed] without any notable psychiatric behaviors on interview [with Dr. Villanueva]."  Id.

Regardless, Dr. Benincasa opined that Dr. Villanueva's diagnosis was "a reasonable appraisal of the data obtained."  AR 652.  However, because the "data obtained does not make sense with the previous testing and [Ayers'] presently high and higher level of functioning," Dr. Benincasa concluded that Ayers "did not involve himself in full effort."[5]  AR 652.  Specifically regarding Ayers' depression, Dr. Benincasa noted that "a number of depressed patients, about a third, continue to have cognitive weakness on neuropschological tests despite being in remission and leading functional lives."  Id.

---

[4]  LINA also sent Dr. Villanueva's report to Dr. Oelke for his opinion.  AR 672.  Dr. Oelke disagreed with Dr. Villanueva's assessment, but the only explanation he provided was a brief handwritten note stating that Ayers' "depression is mild but [secondary] to [CFS] which has worsened over the last 4-5 months."  AR 672.

[5]  In a follow-up note addressed to LINA from March 25, 2005, Dr. Benincasa interpreted test results generated by Dr. Villanueva that were missing at the time of his initial review. Based on these test results, Dr. Benincasa opined, and contrary to his previous report, Ayers was not malingering and his cognitive test results were valid.  AR 1931.

LINA later "[v]erified verbally" with Dr. Benincasa that it "would not be able to make a distinction to verify 100 percent if cognitive deficits were either due to depression or [CFS]." AR 1928. As such, Ayers' claim was "de-escalated" and LINA continued to pay monthly LTD benefits.

### xi. Physical Ability Assessments and Functional Capacity Evaluations from 2005 Through 2007

From 2005 through 2007, the only medical treatment that Ayers received was from Dr. Oelke. Unsatisfied with Dr. Oelke's opinion and in order to better assess Ayers' claim, LINA ordered two additional PAAs and two additional Functional Capacity Evaluations ("FCE"). See LINA's Memo. in Supp. of Mot. Summ. J. on Benefits Claim 19-20.

#### a. 2005 FCE

In February 2005, Miriam Zomerschoe, a physical therapist, performed an FCE. AR 699-725, 760-63. The FCE revealed that, while Ayers was physically capable of performing some of the job demands of an attorney, his limitations in reaching, handling, and fingering ultimately prevented him from working in that capacity. AR 699. Ms. Zomerschoe also noted that Ayers "did seem to fatigue through the examination, especially when testing more physical activity." Id.

#### b. 2006 PAA

Dr. Oelke performed a second PAA on August 9, 2006. Dr. Oelke opined that Ayers was capable of sitting, reaching at desk level, fine manipulation, simple grasping, and lifting and carrying under

Page 21 - OPINION AND ORDER

ten pounds "frequently" (between two-and-a-half and five-and-a-half hours per eight hour period). AR 926. Dr. Oelke also noted that Ayers was capable of standing, walking, reaching overhead and below the waist, firm grasping, lifting and carrying between eleven and twenty pounds, pushing and pulling up to twenty pounds, climbing stairs and ladders, balancing, stooping, and kneeling "occasionally" (less than two-and-a-half hours per eight hour period). AR 926-27. Finally, Dr. Oelke opined that Ayers could not work extended shifts or overtime because his endurance was "very variable from day to day." AR 927.

Based on Dr. Oelke's PAA, LINA performed a transferable skills analysis ("TSA") on August 11, 2006; the TSA indicated that Ayers was physically capable of working as an attorney. AR 892-93.

On November 1, 2006, Dr. Oelke sent a letter of correction regarding his 2006 PAA to LINA. Despite the fact that he had already used the same PAA form in 2004, Dr. Oelke explained that he "misrepresented the [2006 PAA]" due to mistakenly assessing Ayers' abilities over a twenty-four hour, rather than eight hour, period. AR 959. As such, Dr. Oelke corrected his findings so that "the things I marked frequently should be occasionally at best." Id. Dr. Oelke concluded that Ayers was "totally incapable of going back to his occupation as a lawyer." Id. LINA did not perform another TSA based on Dr. Oelke's updated PAA.

### c.   2007 FCE and PAA

After reviewing Dr. Oelke's letter stating that he had misrepresented Ayers' physical abilities in the 2006 PAA, LINA

requested another FCE "because it was unclear what Ayers' physical abilities were at that time." LINA's Memo. in Supp. of Mot. Summ. J. on Benefits Claim 20; see also AR 1004. The second FCE was performed by Karen Rohlf, a physical therapist, in January 2007. AR 1064-80. Ms. Rohlf also generated a PAA based on the FCE results. AR 1079-80.

Ms. Rohlf's FCE indicated that Ayers "was able to perform all physical tests with some limitations [and] was able to sit continuously."[6]   AR 1064.   She noted that Ayers demonstrated "increased symptoms of pain and fatigue upon presenting for day 2 testing including both lower extremities [and, as a result, the] second day is more reflective of what [Ayers] is capable of repeating on a day to day basis." AR 1064, 1068, 1070-72. Ms. Rohlf also noted "increased concentration and cognitive problems with increased physical activity." AR 1065. Ayers became so fatigued during testing that he had to lie down periodically. AR 1064. Ms. Rohlf, however, was unable to assess whether Ayers could perform the job functions of an attorney because "[n]o job description [was] provided." AR 1065.

In the PAA, Ms. Rohlf opined that Ayers could sit

---

[6] Ms. Rohlf later testified that her remark regarding Ayers' ability to sit was changed by her employer WellWorks; she originally noted that "client was able to sit for 55 minutes with one interruption." Glor Decl. Ex. 105, at 6-7. In clarifying her original notes, Ms. Rohlf stated that "[Ayers] is not able to sit for more than 30 minutes and [has] problems concentrating." Id. at 9.

"continuously"[7] (more than five-and-a-half hours per eight hour
period). She also remarked that Ayers could "frequently" (between
two-and-a-half and five-and-a-half hours per eight hour period)
stand, reach, simple grasp, lift up to twenty pounds, carry up to
thirty pounds, climb stairs, balance, stoop, and crawl. AR 1079-
80. In addition, Ms. Rohlf found that Ayers was able to
"occasionally" (less than two-and-a-half hours per eight hour
period) walk, perform fine manipulation, firm grip, lift up to
twenty pounds, carry up to sixty pounds, push and pull between
sixty-three and seventy-seven pounds, kneel, and crouch. AR 1079-
80. The PAA notes, however, that Ayers "showed signs of fatigue
and concentration/cognitive difficulties with ongoing physical
activities." AR 1080.

### xii. Dr. DeFilippis

On May 29, 2007, LINA informed Ayers that it was still unclear
whether he was eligible for benefits under the terms of the Policy.
AR 1155-59. Specifically, LINA noted that "[u]ntil we acquire
information regarding your limitations and restrictions from a
neurological standpoint, we are uncertain as to what precludes you
from performing the duties of your own occupation." AR 1158.
Thus, LINA requested that Ayers submit to another evaluation; on
June 15, 2007, Ayers declined LINA's request, stating that it was
"not appropriate" and "unreasonable." AR 1171-77.

---

[7] During her deposition, Ms. Rohlf explained that Ayers' was
actually able to sit "frequently" (between two-and-a-half and
five-and-a-half hours per eight hour period) rather than
"continuously" (more than five-and-a-half hours per eight hour
period). Glor Decl. Ex. 105, at 8.

Accordingly, LINA referred Ayers' records to Nick DeFilippis, Ph.D., an in-house psychologist, for a peer review.  AR 1191-1200. In August 2007, Dr. DeFilippis issued a report, which concluded that Ayers' cognitive difficulties were related to depression and a possible somatoform disorder.  AR 1999.

Dr. DeFilippis opined that CFS was not implicated because "psychiatric problems need to be ruled out" before such a diagnosis is made.  Id.  Specifically, Dr. DeFilippis explained that "it is not evident from the records that the diagnosis of [CFS] was applied before there was an adequate attempt to rule out the presence of a psychological issue."  Id.  As such, Dr. DeFilippis noted that "the most parsimonious explanation for [Ayers'] cognitive difficulties identified by Dr. Villanueva is that [an] emotional factor cause[d] them."  AR 1200.  Nevertheless, Dr. DeFilippis opined that these cognitive difficulties precluded Ayers' employment as an attorney.  AR 1199.      Based on these findings and the 2007 FCE, LINA concluded that Ayers had the ability to perform the regular physical duties of an attorney; LINA also determined that Ayers' cognitive difficulties were related to depression and therefore the MIL applied.  AR 1224-26.  As a result, Ayers' LTD benefits were terminated.  AR 1227.

D.  Analysis

Because the Policy defines disability broadly as any impairment that prevents an employee from "perform[ing] all the material duties of his or her regular occupation," the issue before the Court is not whether Ayers qualifies for LTD benefits; it is in

fact undisputed that his cognitive difficulties prevent him from practicing law. Further, it is undisputed that, under the terms of the Policy and Ninth Circuit precedent, CFS is a physical condition to which the MIL does not apply. AR 9; see also Glor Decl. Ex. C., at 2; Mongeluzo v. Baxter Long Term Disability Benefits Plan, 46 F.3d 938, 942-44 (9th Cir. 1995). As such, the issue before the Court is whether Ayers met his burden in proving that his disabling cognitive difficulties are caused by CFS.

LINA asserts that the medical records outlined above are sufficient to establish that Ayers' cognitive impairments stem from a psychiatric condition. Conversely, Ayers argues that his fatigue and other physical symptoms began two years before his depression; further, he contends that, while he was depressed over the loss of his job and other life events in 2001, his depression resolved itself by 2003, yet his disabling symptoms persisted. Accordingly, Ayers asserts that CFS is the genesis of his disability.

As a preliminary matter, it should be noted that Ayers meets the diagnostic criteria, as outlined in section II(B), for CFS. The record reveals that, since 1999, Ayers has undergone a battery of tests to rule out potential causes of his symptoms. As discussed above, Ayers has undergone an HIV test, blood work, an EKG, a treadmill test, chest x-rays, stool and urine tests, and an MRI. AR 25, 31-33, 36-37, 40-53, 59-61, 63-67, 71-76. He has also consulted a radiologist, ophthalmologist, neurologist, rheumatologist, and psychotherapist in order to exclude other possible causes. AR 82-83, 101-04, 111. Ayers' test results were

Page 26 - OPINION AND ORDER

unremarkable.

Reports from Mr. Robinett, Dr. Bastien, Dr. Oelke, and Dr. Ravuri, as well as the PAAs and FCEs, document Ayers' ongoing chronic fatigue, which was not alleviated by rest and resulted in substantially limited daily functioning. AR 243, 321, 126-27, 303, 322, 360, 385, 1182, 699, 959, 1064, 1068, 1070-72. Moreover, the record reveals that this fatigue was not lifelong. Rather, Ayers enjoyed activities such as boogie boarding, roller-blading, tennis, racquet ball, swimming, bike riding, and hiking, as well as going out to dinner, movies, plays, and art receptions, prior to the onset of these symptoms in 1999. AR 275. Further, there is no evidence that Ayers' symptoms are likely to remit in the near future. AR 1016, 1445 (CDC guidelines stipulate that "those who have CFS for two years or less [are] more likely to improve"; nevertheless, only "5-10% sustai[n] complete remission"), 1462 (Cigna's CFS guidelines are consistent with the CDC, noting that "most [CFS patients] remain functionally impaired for years").

In addition, Ayers has consistently reported, and his medical examiners have observed, symptoms of poor memory, impairments in concentration, sore throat, muscle and joint pain without swelling or redness, headaches, unrefreshing sleep, and increased fatigue and discomfort after exertion. AR 34, 62, 118-26, 148, 151, 242, 302-03, 322, 336, 363, 385, 406, 470-74, 659, 699, 927, 959, 1064-65, 1182, 1199, 1363-71. Ayers has exhibited additional CFS symptomology as well; he has suffered a significant drop in IQ with a "split" between his verbal and performance scores. AR 118, 474.

Page 27 - OPINION AND ORDER

He has also exhibited cognitive difficulties over a wide variety of tests; every doctor opined that Ayers was not malingering and that his test results were valid. As such, Ayers meets the CDC's and LINA's diagnostic criteria for CFS.

Moreover, it is undisputed that Ayers' symptoms have remained the same, or worsened, since he applied for benefits under HRB's Policy. It is also undisputed that LINA initially construed these symptoms as both disabling and falling outside of the MIL. See LINA's Resp. to Ayers' Mot. Summ. J. on Benefits Claim 15 n.6 ("LINA paid [Ayers] for benefits based on a diagnosis of CFS for more than five years"). In addition, LINA knew that it was impossible "to verify 100 percent [whether] cognitive deficits were either due to depression or [CFS]." AR 1928.

Regardless, the Court acknowledges that there is some disparity in the opinion evidence; while all of the medical sources describe relatively the same symptoms and limitations, they vary in their conclusions regarding the cause of these impairments.

Dr. Bastien, the only CFS specialist on record, explicitly stated that "depression alone cannot account for" Ayers' disabling cognitive difficulties. AR 126. She further opined that, while depression can impact an individual's cognitive functioning, in Ayers' case that was not true; rather, based on her four days of testing, she concluded that CFS was the cause of both his cognitive impairments and his depression. AR 126-27.

Dr. Oelke, Ayers' treating physician, repeatedly opined that Ayers was disabled by CFS. AR 810, 959, 1182. Dr. Oelke tracked

Page 28 - OPINION AND ORDER

Ayers' symptoms over a five year period. During this time, Dr.
Oelke never noted that Ayers appeared depressed or anxious; Ayers
also never reported feeling depressed or anxious. As such, Dr.
Oelke did not refer Ayers to a mental health specialist or
prescribe anti-depressants.

Conversely, Drs. Villanueva, Benincasa, and DeFilippis
construed Ayers' depression as the cause of both his cognitive
difficulties and physical symptoms.[8] AR 475, 652, 1192. Dr.
Villanueva, the only examining source who opined that Ayers'
disability was caused by depression, reported considerable
cognitive impairments; most notably, he recorded a drop in Ayers'
IQ from 126 to 98. AR 474.

Dr. Villanueva's report also established that Ayers was no
longer suffering from disabling depression. In 2001, Dr. Bastien
assessed Ayers with a GAF score of 45, indicating significantly
debilitating depression. AR 126. Three years later, after Ayers
had ceased treatment for his depression and reported that it was in

---

[8] LINA also relies on the opinions of Drs. Ravuri and
Bargalow in support of its denial of benefits. See LINA's Resp.
to Ayers' Mot. Summ. J. on Benefits Claim 17-20. LINA's
reliance, however, is misplaced. There are no reports from Dr.
Bargalow in the administrative record. His name is only
mentioned once in a handwritten note from Ayers. AR 157.
According to Ayers, Dr. Bargalow opined that he was suffering
from "depression disorder, anxiety disorder, pain disorder,
somatization disorder, and fibromyalgia," but not CFS. Id. Like
Dr. Nolan, Dr. Bargalow "does not believe in [CFS]"; accordingly,
the opinions of Drs. Bargalow and Nolan are of little value. AR
148, 157. Further, contrary to LINA's assertion, Dr. Ravuri
never diagnosed Ayers with depression. AR 300, 302, 303, 322.
In fact, Dr. Ravuri's reports reflect that Ayers' depression was
in remission by 2003. AR 302. In addition, Dr. Ravuri listed
CFS as Ayers' primary diagnosis; as such, his opinion supports,
rather than detracts from, Ayers' benefits claim. AR 322.

remission, Dr. Villanueva assessed him with a GAF score of 65, indicating nominal limitations. AR 652. Dr. Villanueva does not attempt to explain how Ayers' depression markedly improved while his cognitive impairments substantially worsened. This discrepancy does not appear to factor into his diagnosis.

Drs. Benincasa and DeFilippis did not examine Ayers; instead, they were LINA doctors retained to review Ayers' file after Dr. Villanueva's examination. AR 1191, 1928, 1931-32. Both doctors reiterated Ayers' symptoms, which are consistent with CFS, and noted that objective tests revealed significant cognitive impairments. AR 651, 1195-99.

Nevertheless, Dr. Benincasa concluded that depression was the correct diagnosis because Ayers failed to effectively rule out other causes: "[o]ne would not consider CFS or Fibromyalgia given the early presentation of depressive symptoms at about the same time." AR 652. The record reveals, however, that Ayers was reporting fatigue and other CFS symptoms in 1999, whereas he did not become depressed until 2001, when he was no longer able to work because of his disability.

Dr. Benincasa's report actually substantiates Ayers' assertion that his depression was in remission by 2003. Dr. Benincasa reiterated that Ayers had only "mild symptoms [of depression] with a GAF of 65." AR 652. Later parts of the report confirm that Ayers was no longer actively suffering from depression, as Dr. Benincasa expressly noted that some patients who have recovered from depression, like Ayers, still show cognitive slippage while in

Page 30 - OPINION AND ORDER

remission.  AR 652.

Dr. DeFilippis opined that Ayers' symptoms were caused by depression for the same reason as Dr. Benincasa; CFS was not a viable diagnosis because "it is not evident from the records that the diagnosis of [CFS] was applied before there was an adequate attempt to rule out the presence of psychological issues."  AR 1199.  Dr. DeFilippis also found that depression was the most likely explanation for Ayers' symptoms because he "has a significant family history of depression, which would support his presenting with that condition."  Id.

As discussed above, however, Ayers' fatigue, muscle pain, sore throats, cough, headaches, unrefreshing sleep, and chest pain predate the onset of his depression by two years.  Compare AR 34 (onset of CFS symptoms in 1999), with AR 199 (onset of depression in 2001).  Further, contrary to Dr. DeFilippis' conclusion, Dr. Bastien expressly stated that even severe depression could not account for Ayers' substantial cognitive impairments.  AR 126. Thus, Ayers' family history of depression is irrelevant because the record reveals that psychological issues were properly ruled out at the time the CFS diagnosis was applied.

As such, the Court finds that the opinions of Drs. Villanueva, Benincasa, and DeFilippis do not provide convincing evidence that depression, rather than CFS, caused Ayers' cognitive disability. These doctors all failed to address the fact that Dr. Bastien eliminated depression as a potential cause and that, by 2003, Ayers' depression was in remission while his cognitive difficulties

continued to worsen. Thus, by cursorily concluding that psychological issues were the cause of Ayers' cognitive impairments, Drs. Villanueva, Benincasa, and DeFilippis committed the very error that they purport to avoid; namely, by applying the diagnosis of depression without considering other potential causes or Ayers' significant medical history.

Nonetheless, LINA asserts that its principal reliance on the opinions of Drs. Villanueva, Benincasa, and DeFilippis was proper for two reasons. First, LINA asserts that it was not bound by Dr. Oelke's opinion because the Supreme Court rejected the "treating physician rule" for ERISA cases, which required that special deference be given to the opinion of a treating physician. See Black and Decker v. Nord, 538 U.S. 822, 834 (2003).

The Ninth Circuit has held, however, following the Supreme Court's decision in Nord, that "a district court may, in conducting its independent evaluation of the evidence in the administrative record [on de novo review], take cognizance of the fact . . . that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator." Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Protection Plan, 349 F.3d 1098, 1109 (9th Cir. 2003) (citations and internal quotations omitted). Ayers has been a patient of Dr. Oelke for over five years; Dr. Oelke examined Ayers over dozens of appointments and observed him at regular monthly intervals. The Court is not convinced that, because Dr. Oelke is a general practitioner with no specialization in mental illness,

Page 32 - OPINION AND ORDER

his observations of Ayers and his medical opinion are any less valid than those opinions of LINA's examining and reviewing psychologists.

Second, LINA argues that the opinions of Dr. Bastien and Mr. Robinett are not binding because they failed to rule out depression as an underlying cause and more recent doctors reached opposite conclusions regarding the origination of Ayers' disabling symptoms. See LINA's Resp. to Ayers' Mot. Summ. J. on Benefits Claim 26. As discussed above, however, Dr. Bastien did rule out depression as a potential cause; she explicitly stated that depression, alone, could not account for Ayers' cognitive difficulties. AR 126. Dr. Bastien is also the only CFS expert involved in this case. Given the inherent challenges in diagnosing CFS, her opinion as a specialist is entitled to more deference. See Friedrich, 181 F.3d at 1111-12 (construing Dr. Bastien's report as objective evidence of CFS and relying heavily on her opinion, even though there were conflicting reports in the record, to determine that the claimant was entitled to LTD benefits). LINA was free to hire its own CFS specialist to examine Ayers or review his file, but chose not to. Therefore, it was improper for LINA to disregard Dr. Bastien's opinion.

Mr. Robinett, Ayer's therapist from 2001 to 2002, did not diagnose Ayers with CFS; rather, Mr. Robinett indicated that Ayers' medical history reflected a CFS diagnosis. AR 199. As a mental health specialist, Mr. Robinett was retained to aid Ayers in resolving his depression and anxiety, not for CFS treatment. Id.

Page 33 - OPINION AND ORDER

As such, contrary to LINA's assertion, Mr. Robinett was never tasked with excluding potential causes of Ayers' symptoms. It is significant, however, that Mr. Robinett reported that Ayers was not suffering from a psychological or emotional problem prior to 2001 and that his CFS symptomology predated the onset of these mental impairments by two years. Id. Thus, it was similarly improper for LINA to disregard Mr. Robinett's opinion.

Additional evidence supports Ayers' contention that the application of the MIL was improper in this case. Contrary to LINA's conclusion, the most recent PAAs and FCEs reveal that Ayers had physical limitations that prohibit his employment as an attorney. The Dictionary of Occupational Titles ("DOT") states that an attorney must be physically able to reach, handle, and finger "frequently" (between two-and-a-half and five-and-a-half hours per eight hour period). AR 228-29. The DOT also lists the ability to "mostly sit" during the workday as an occupational requirement. AR 229.

Here, the 2005 FCE reveals that Ayers' deficiencies in reaching, fingering, and handling prevent him from working as an attorney. AR 699. The 2007 FCE stipulated that Ayers was unable to sit for more than thirty minutes at a time; the 2007 PAA confirmed that Ayers could not sit for more than five-and-a-half hours in an eight hour period. Glor Decl. Ex. 105, at 6-9. Thus, Ayers' limitations in sitting also preclude the practice of law. Accordingly, because Ayers had "a physical condition [that] contribute[d] to the total disability, or [was] either a cause or

Page 34 - OPINION AND ORDER

symptom of a mental disability," it was improper for LINA to apply the MIL, even if depression was the underlying cause of Ayers' cognitive difficulties.

Finally, the SSA determined that Ayers was unable to work at any job in the national economy due to his CFS and awarded SSDI benefits. AR 1301, 1371. While SSA decisions are not binding on plan administrators, they are nonetheless persuasive evidence of disability. Salomaa, 642 F.3d at 679 (citing Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009)). Because Ayers was awarded SSDI benefits after LINA denied his appeal, the favorable SSA decision was not available for plan administrators to review; regardless, the Court finds this evidence compelling. See Mongeluzo, 46 F.3d at 943-44 ("new evidence [not before the plan administrator] may be considered [by the district court] under certain circumstances to enable the full exercise of informed and independent judgment").

Therefore, because Ayers' impairments and inability to work as an attorney are well-documented in the administrative record, and because Ayers met his burden in proving that these limitations were caused by CFS, the Court finds that Ayers is entitled to a continuation of benefits under the Policy. As such, Ayers' motion for summary judgment on the benefits claim is granted and LINA's motion is denied.

III.   Overpayment Claim

It is undisputed that the Policy authorizes LINA to recover any amounts, as overpaid benefits, that the insured receives as a

retroactive lump sum SSDI award. AR 11-12. In addition, it is undisputed that Ayers received over a hundred thousand dollars in SSDI benefits. Answer to LINA's Countercl. ¶¶ 15-16. Ayers, however, asserts that LINA is foreclosed from recovering these amounts due to its bad faith. Thus, the issue before the Court is whether the equitable defense of unclean hands bars LINA's receipt of such benefits.

A. Application of Equitable Defenses to Claims Brought Under 29 U.S.C. § 1132(a)(3)

As a preliminary matter, LINA contends that common law equitable theories do not apply to ERISA claims where the plan unambiguously grants the insurer the right to recover any overpayments. Conversely, Ayers asserts that equitable defenses, such as unclean hands, apply to any equitable claim, even those brought under ERISA.

ERISA authorizes fiduciaries to bring suit in federal court to obtain "appropriate equitable relief" in order to enforce the provisions of its LTD plan. 29 U.S.C. § 1132(a)(3)(B). The Supreme Court explained that "equitable relief," as referred to in this portion of the statute, "mean[s] something less than all relief." Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209 (2002) (internal quotation and emphasis omitted). As such, the term "equitable relief" refers only to "those categories of relief that were typically available in equity." Id. at 210 (internal quotation and emphasis omitted).

Here, LINA asserts that, under the terms of the Policy, it is

Page 36 - OPINION AND ORDER

entitled to an equitable lien by agreement on Ayers' SSDI benefits. See LINA's Memo. in Supp. of Mot. Summ. J. on Overpayment Claim 8-9. Imposition of an equitable lien is an allowable remedy under section 1132(a)(3)(B). Great-West, 534 U.S. at 213. Accordingly, LINA's claim lies "in equity."

LINA cites to a plethora of authorities in support of its contention that equitable theories do not apply to ERISA claims. See LINA's Reply to Mot. Summ. J. on Overpayment Claim 3 (citing Cinelli v. Security Pac. Corp., 61 F.3d 1437, 1444 (9th Cir. 1995); Parker v. BankAmerica Corp., 50 F.3d 757, 769 (9th Cir. 1995); Aetna Life Ins. Co. v. Kohler, 2011 WL 5321005, *6-7 (N.D.Cal. Nov. 2, 2011); and authorities from the Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits). Ayers merely cites to a single case in support of his contention that "an insurer's unclean hands may bar its claim under . . . § 1132(a)(3) to recover overpaid health insurance benefits." Ayers' Memo. in Supp. of Mot. Summ. J. on Overpayment Claim 5-6 (citing Providence Health Plan v. Charriere, 666 F.Supp.2d 1169, 1182 (D.Or. 2009)).

The Court agrees with Ayers. The authorities that LINA relies on are not applicable in the present case; these cases hold that the "federal common law rule[s] of contract interpretation" cannot be applied to override the express terms of an ERISA plan. See Cinelli, 61 F.3d at 1444; Parker, 50 F.3d at 769; Aetna Life, 2011 WL 5321005 at *6-7. These cases, however, do not address whether equitable defenses, such as unclean hands, are applicable to claims brought under section 1132(a)(3). Id. While the Court

Page 37 - OPINION AND ORDER

acknowledges the general proposition that common law contract principles do not apply where the terms of a written insurance policy are unambiguous, this issue does not resolve whether LINA's equitable claim may be precluded by an equitable defense.

The only relevant authority from this District is Providence Health Plan v. Charriere. In Providence, the LTD insurer brought an overpayment claim pursuant to section 1132(a)(3). Providence, 666 F.Supp.2d at 1182. The plan's beneficiary raised the affirmative defense of unclean hands, alleging that the insurer wrongfully terminated benefits owed under the LTD plan; the court held that the defense applied to ERISA claims brought under 29 U.S.C. § 1132(a)(3) because the claim and the defense were both equitable in nature. Id. (citing Del Monte Fresh Produce, N.A., Inc. v. H.J. Heinz Co., 2008 WL 607415, *1 (D.Or. Feb. 29, 2008); Thompson v. Coughlin, 329 Or. 630, 633, 997 P.2d 191 (2000); and Cal. Dep't of Toxic Substances Control v. Neville Chem. Co., 358 F.3d 661, 672-72 (9th Cir. 2004)); see also Admin. Comm. for Wal-Mart Stores, Inc. Assocs.' Welfare Plan v. Salazar, 525 F.Supp.2d 1103, 1114 (D.Ariz. 2007) (applying unclean hands as an affirmative defense to a claim brought under section 1132(a)(3)). Therefore, where, as here, the claim is brought "in equity," equitable defenses apply. As such, LINA cannot recover any overpaid amounts pursuant to section 1132(a)(3) if Ayers can demonstrate that it was acting with unclean hands.

B. Unclean Hands

To establish unclean hands, the party asserting the defense must demonstrate that "'the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.'" Providence, 666 F.Supp.2d at 1182 (quoting Brother Records, Inc. v. Jardine, 318 F.3d 900, 909 (9th Cir. 2003) (internal quotations omitted)). "'[E]quity requires that those seeking its protection shall have acted fairly and without fraud or deceit as to the controversy in issue.'"   Id. (quoting Ellenburg v. Brockway, Inc., 763 F.2d 1091, 1097 (9th Cir. 1985)).   The doctrine, however, is not without limitations: "[i]n quantitative terms, the misconduct must be serious enough to justify a court's denying relief on an otherwise valid claim.  Even equity does not require saintliness." Malbco Holdings, LLC v. Amco Ins. Co., 2010 WL 143778, *5 (D.Or. Jan. 11, 2010) (citations omitted).

Here, Ayers contends that LINA sabotaged his application for SSDI benefits.  Specifically, Ayers argues that LINA brought its overpayment claim in bad faith because it knew that its interest in any overpaid amounts "expired when the [SSA] Appeals Council upheld the ALJ's claim denial in May 2005."[9]   Ayers' Memo. in Supp. of

_____

[9] Regarding LINA's unclean hands, Ayers also asserts that he would not have applied for SSDI "but for" LINA's misrepresentations and "wrong[ful] withholding [of] LTD benefits."  Ayers' Memo. in Supp. of Mot. Summ. J. on Overpayment Claim 14.  As discussed in section I, however, the terms of the Policy allow LINA to offset monthly benefits by the assumed receipt of other income, including SSDI benefits.  AR 11-12. Therefore, LINA had the right to withhold LTD benefits regardless of whether Ayers applied for or received SSDI; as such, Ayers cannot sustain an affirmative defense on this basis.

Mot. Summ. J. on Overpayment Claim 14. Ayers also asserts that LINA engaged in a vast conspiracy to unfairly, without justification, and in contravention of the Policy, terminate his LTD benefits.

> i.  Expiration of LINA's Interest in Ayers' SSDI

Ayers contends that LINA is not entitled to receive any portion of his SSDI benefits for three reasons: 1) Ayers' exhausted his administrative appeals with the SSA; 2) LINA stopped tracking his SSDI claim in 2005, "confirming that [LINA] knew it had no further interest" in those benefits; and 3) LINA did not give notice of its overpayment claim until this action. Ayers' Memo. in Supp. of Mot. Summ. J. on Overpayment Claim 15-30.

First, in asserting that LINA's interest "expired" when he exhausted his administrative appeals with the SSA, Ayers confuses LINA's right to recover an overpayment with its right to assume receipt of Other Income Benefits.

As discussed in section I, the Policy's "Other Income Benefits" provision requires that an employee's monthly LTD benefits be "reduced by any . . . benefits from other income sources, [including] any [SSDI] benefits the Employee . . . receives." AR 4, 11. LINA's interest in Ayers' income from other sources is so broad that it can reduce monthly LTD payments simply by "assum[ing]" that Ayers is eligible for other benefits, even if he was not actually receiving them. AR 11. The Policy's "Social Security Assistance" provision, which is a subset of Other Income Benefits, is also relevant; it states that LINA "will assume the

Page 40 - OPINION AND ORDER

receipt of SSDI benefits until the Employee gives us proof that all administrative remedies are exhausted." AR 12.

In addition, the Policy contains a separate "Recovery of Overpayment" provision, which provides that, if benefits are overpaid for any reason, LINA "has the right to recover the amount overpaid by . . . [a] request for a lump sum payment of the overpaid amount." AR 11.

Moreover, Ayers signed a Reimbursement Agreement, which states:

> If I later receive [SSDI] benefits . . . I agree to reimburse the full amount of the overpayment within 30 days of receiving my [SSDI] award. I understand that [LINA] will recover an overpayment that occurs by reducing future LTD Monthly Benefits . . . I acknowledge that if I obtain a [SSDI] award, all or a portion of any retroactive [SSDI award] must be repaid to [LINA] . . . in accordance with the terms of my [Policy].

AR 163, 11.

Thus, LINA's interest in the assumed receipt of SSDI benefits "expires" when "the Employee provides proof that all administrative remedies are exhausted." AR 11. Other provisions of the Policy, however, make clear that LINA is entitled to recover overpayment of any other benefits that an Employee actually receives: LINA expressly has the right, at any time, "to recover [any] amount[s] overpaid"; further, by signing the Reimbursement Agreement, Ayers explicitly agreed that if "I later receive [SSDI] benefits . . . I [will] reimburse the full amount of the overpayment [to LINA]." Accordingly, the unambiguous terms of the Policy establish that LINA's interest in any overpaid benefits never expires. AR 11-12, AR 163.

Second, the fact that LINA stopped tracking Ayers' SSDI claim in 2005 is not evidence that its interest in that award expired. When Ayers retained private counsel in 2005, LINA could no longer receive direct updates from Allsup regarding the SSDI claim. Instead, LINA became reliant on Ayers for such updates. Ayers, however, was not diligent in providing this information to LINA; as such, LINA did not have any SSDI claim updates to record. Thus, the fact that LINA stopped tracking Ayers' SSDI claim is immaterial.

Third, LINA's failure to seek compensation for these overpaid amounts until this action commenced is inconsequential. Ayers had an independent contractual duty to reimburse LINA for overpayments out of his SSDI award, which he failed to do. As such, LINA did not learn of Ayers' SSDI award until he filed his benefits claim in this Court. As such, LINA had no opportunity prior to this action to pursue reimbursement for its overpayment.

Accordingly, LINA had an equitable lien on any retroactive SSDI award, even if such an award was received after Ayers' exhausted his administrative remedies and terminated his relationship with Allsup. Thus, LINA's overpayment claim is not, alone, evidence of bad faith.

ii. Other Evidence of Unclean Hands

Ayers also contends that LINA has unclean hands because: 1) it sabotaged his SSDI claim; and 2) it made fraudulent statements and commissioned false medical reports to facilitate termination of his

Page 42 - OPINION AND ORDER

LTD benefits under the MIL.[10]  See generally Ayers' Memo. in Supp. of Mot. Summ. J. on Overpayment Claim.

### a.  SSDI Benefits Claim

Ayers cites to copious portions of the administrative record in support of his contention that Allsup intentionally sabotaged his SSDI claim.  AR 536-72, 664, 785, 790, 835-36, 1018, 1022, 1371, 1923, 1951; see also Glor Decl. Ex. 75-82.  LINA contends that "there is no evidence that LINA played any role in [Ayers'] SSDI claim or that it participated in the [alleged] conduct." LINA's Resp. to Ayers' Mot. Summ. J. on Overpayment Claim 9.

In addition, LINA notes that neither it nor Allsup had a motive to sabotage Ayers' SSDI claim: "[if Ayers'] SSDI claim fails, LINA must pay full benefits without any offset.  But if he succeeds, then . . . LINA is entitled to offset its LTD payments by the amount of [Ayers'] SSDI award"; similarly, under their contract, Allsup is only compensated by LINA if it successfully obtains SSDI benefits.  Id.; see also Patton Decl. Ex. 1, at 4. Accordingly, LINA argues that both it and Allsup "clearly had an incentive to do what [they] could to help [Ayers'] SSDI claim

---

[10] Ayers also asserts that LINA has unclean hands because it "required that he satisfy an 'any occupation' definition of disability." Ayers' Memo. in Supp. of Mot. Summ. J. on Overpayment Claim 40.  LINA "acknowledges that in some of its correspondences it stated that the 'any occupation' standard applied . . . This was a mistake." LINA's Resp. to Ayers' Mot. Summ. J. on Overpayment Claim 7.  The Court finds that this mistake was not indicative of bad faith and, moreover, ultimately harmless, as LINA paid over $300,000 in monthly benefits based on the determination that Ayers could no longer practice law. Therefore, this contention will not be addressed further as part of Ayers' equitable defense.

succeed." Id. at 9-10.

Here, most of the documents that Ayers cites to are letters that he sent to LINA regarding inadequacies in Allsup's representation or chart notes from Dr. Oelke reflecting Ayers' dissatisfaction with Allsup. See AR 664 (chart note from Dr. Oelke noting that Ayers "has been very upset about how he was represented"), 785 (letter notifying LINA that Ayers retained independent counsel), 835-36 (letter to LINA detailing how Allsup sabotaged his SSDI claim), 1018 (letter to LINA with SSDI update), 1022 (letter reporting "Allsup's sabotage of the [SSDI] appeal" to LINA), 1371 (chart note from Dr. Oelke reflecting that Ayers prevailed in his SSDI claim). These portions of the record, however, only reflect Ayers' personal belief that Allsup mishandled the claim and, accordingly, are not, alone, evidence of unclean hands.

The other portions of the record to which Ayers cites are LINA's internal notes or documents generally reflecting the SSDI application process. AR 536-72 (ALJ hearing transcript), 790 (SSA form request for a SSDI hearing), 1923 (LINA's internal note reflecting that Ayers "was not impressed with Allsup"), 1951 (LINA's internal note indicating that Ayers was "upset regarding [Allsup's] representation"). Thus, these documents are also not direct evidence of bad faith.

When viewed in its entirety, the evidence that Ayers relies on merely suggests that Allsup could have handled his SSDI claim differently. These excerpts of the record, however, fail to link

Page 44 - OPINION AND ORDER

LINA to the allegedly wrongful conduct. Accordingly, this evidence is insufficient to establish that LINA was acting affirmatively with "fraud or deceit" as to Ayers' SSDI claim. Providence, 666 F.Supp.2d at 1182. Therefore, Ayers cannot sustain an unclean hands defense based on Allsup's representation.

### b. LTD Benefits Claim

Ayers next asserts that "[t]here is extensive evidence that [LINA] conspired to set up a bad faith termination" of his LTD benefits. Ayers' Memo. in Supp. of Mot. Summ. J. 31. Conversely, LINA contends that "there is no competent evidence to support" Ayers' conspiracy theory. LINA's Resp. to Ayers' Mot. Summ. J. on Overpayment Claim 8.

Ayers again cites to numerous portions of the administrative record in support of his contention. AR 84, 113-27, 173, 178, 181-82, 192, 224-27, 233-34, 238, 241-43, 373-74, 411, 644, 699-725, 727-30, 1002-04, 1089, 1144, 1183, 1212, 1332, 1844; see also Glor Decl. Ex. 105, at 6-9. The majority of these documents are medical reports and LINA's internal notes regarding Ayers' LTD claim; these reports are generally favorable to Ayers and reflect that his cognitive difficulties prevent him from working as an attorney. AR 84, 113-27, 173, 178, 181-82, 192, 233-34, 238, 241-43, 373-74, 411, 644. Accordingly, these portions of the record do not evidence bad intent; rather, they reflect a typical claim analysis and, as such, are largely benign.

Ayers does, however, cite to evidence which indicates that LINA may have misrepresented his physical capabilities or falsified

his psychological record. AR 224-25, 1183, 1212. For example, the
internal notes that directly preceded LINA's termination of Ayers'
benefits do not reflect his deficiency in sitting, which, as
discussed above, precludes his employment as an attorney. AR 1183,
1212. There is also evidence that the reports from Ayers' 2005 FCE
and 2007 PAA and FCE were changed to make Ayers appear more
physically capable. AR 701-02, 727-30; see also Glor Decl. Ex.
105, at 6-9 (Ms. Rohlf, who performed the 2007 PAA and FCE,
testified that her employer changed her remarks, such that Ayers'
reports reflected fewer physical limitations).

In addition, shortly after Ayers applied for LTD benefits,
LINA made an internal notation indicating that Ayers was suicidal.
AR 224-35. Ayers informed LINA that this statement was false. AR
1351. Regardless, LINA never removed this notation, despite the
fact that there is no evidence in the record that Ayers was
suicidal at any point. In fact, LINA repeatedly stated in its
internal notes that Ayers had a "history of depression w/suicidal
ideations." AR 1001-04, 1089, 1144, 1183, 1212, 1332, 1844.

These documents are circumstantial evidence that LINA
falsified, concealed, or changed medical records on which it relied
to terminate Ayers' LTD benefits under the MIL. As such, Ayers has
raised the inference that LINA was acting in bad faith, especially
since LINA knew that it could not "verify 100 percent" whether
Ayers' disability was caused by CFS and, accordingly, would have to
pay benefits indefinitely. There is no direct evidence, however,
that LINA caused or directed these omissions. As such, whether

LINA terminated Ayers' benefits in bad faith hinges on LINA's intent and the parties' credibility.  Thus, it is inappropriate for this Court to resolve the overpayment claim at this stage in the proceedings.  Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (court may not make "[c]redibility determinations or weigh the evidence" on summary judgment).

Therefore, because a genuine issue of material fact exists as to whether LINA made fraudulent statements and commissioned false medical reports to facilitate termination of Ayers' LTD benefits under the MIL, the parties' cross-motions for summary judgment are denied.

## CONCLUSION

LINA's motions for summary judgment (docs. 131, 134) are DENIED.  Ayers' motion for summary judgment on the benefits claim (doc. 127) is GRANTED; his motions for summary judgment on the overpayment claim (doc. 128) and for "unclean hands" (doc. 166) are DENIED.  Accordingly , the parties' requests for oral argument are DENIED as unnecessary.  Finally, the parties are directed to file a status report with this Court within three weeks of the filing date of this opinion.

IT IS SO ORDERED.
Dated this ___19th___ day of April 2012.

Ann Aiken
United States District Judge

Page 47 - OPINION AND ORDER